NOTICE: NOT FOR PUBLICATION.
UNDER ARIZ. R. SUP. CT. 111(c), THIS DECISION DOES NOT CREATE LEGAL PRECEDENT
AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

DESMOND DESHAWN WARREN, *Appellant.*

No. 1 CA-CR 12-0481
FILED 3-27-2014

---

Appeal from the Superior Court in Maricopa County
No. CR2011-152775-003
The Honorable Randall H. Warner, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Robert A. Walsh
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mikel P. Steinfeld
*Counsel for Appellant*

_____

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Margaret H. Downie and Judge Jon W. Thompson joined.

_____

**W I N T H R O P**, Presiding Judge:

**¶1**　　　　Desmond Deshawn Warren ("Appellant") appeals his convictions for two counts of misconduct involving a weapon and one count of possession of narcotic drugs.  Appellant argues that (1) the trial court erred in denying his motion to suppress; (2) Arizona Revised Statutes ("A.R.S.") section 13-3102(A)(1)(b) (West 2014),[1] which requires a person to accurately answer a police officer, violates the Fifth Amendment right against self-incrimination; and (3) the trial court abused its discretion by denying his motion for mistrial.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[2]

**¶2**　　　　On October 11, 2011, Phoenix Police Officers Glidewell and Barton conducted a stop of a Chevrolet Impala in a convenience store parking lot near I-17 and Glendale Avenue in Phoenix.  Appellant was one of four passengers in the Impala.  The officers asked the Impala's occupants whether they possessed any guns or other weapons, and Appellant claimed he was unarmed.  When the officers ran Appellant's name in their computer, however, they discovered an outstanding warrant for his arrest.

**¶3**　　　　The officers ordered Appellant to exit the Impala, and as he did so, Officer Glidewell heard something strike the ground and observed a yellow lighter and a small white rock of crack cocaine near Appellant.  Officer Barton also noticed those items.  As Officer Barton searched

_____

[1]　　　Absent a material revision after the relevant date, we cite a statute's current version.

[2]　　　We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Appellant.  *See State v. Nihiser*, 191 Ariz. 199, 201, 953 P.2d 1252, 1254 (App. 1997).

Appellant incident to arrest, Officer Glidewell heard "the sound of metal hitting the ground" and observed Officer Barton dislodge a loaded, black, semi-automatic handgun from Appellant's pant leg. Officer Barton also found a white rock of crack cocaine in Appellant's right front pants pocket.

¶4 The officers transported Appellant to the precinct station for booking, and during the ride, Appellant spontaneously stated he had a felony charge in Maricopa County scheduled for sentencing on October 31, 2011. He also asked the officers if they could "drop the charge" on the rock cocaine because it was "small-time shit."

¶5 At the station, Officer Barton advised Appellant of his rights pursuant to *Miranda*,[3] and Appellant agreed to speak with him. When asked why he possessed the handgun, Appellant stated, "Because I love my life. Everybody has a gun out there. I refuse to be a victim." Appellant also remarked that he did not know if his convictions in California affected his right to bear arms in Arizona and stated he had not told Officer Glidewell he had a weapon because he knew it would get him in trouble. He admitted "he did not think he was supposed to have a gun," but rationalized "that it's the old west out here and that everybody has guns." Appellant admitted using cocaine "more than once a day," but denied using crack cocaine. He also denied ever buying drugs, but stated friends would give them to him and he had found some "on the ground behind bushes before." Pursuant to an inventory search at the station, Officer Barton found another rock of crack cocaine in Appellant's shoe.

¶6 A grand jury issued an indictment, charging Appellant with three counts: Count III, misconduct involving a weapon, a class one misdemeanor, for failing to accurately answer a law enforcement officer when asked if he was carrying a concealed deadly weapon; Count IV, misconduct involving a weapon, a class four felony, for being a prohibited possessor; and Count V, possession of narcotic drugs, a class four felony, for possession of crack cocaine. At trial, the jury found him guilty as charged, and also found in the aggravation phase of the trial that he was on release for a separate felony offense when he committed the current offenses.

¶7 Before sentencing, the trial court found that Appellant had two historical prior felony convictions. The court sentenced Appellant to

---

[3]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

slightly mitigated, concurrent sentences of six months' imprisonment for Count III and eleven years' imprisonment each for Counts IV and V, with credit for 279 days of presentence incarceration. We have jurisdiction over Appellant's timely appeal pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033.

**ANALYSIS**

### I.     Denial of Motion to Suppress

¶8          Before trial, Appellant filed a motion to suppress, contending the traffic stop was unlawful because the Impala's driver did not commit a traffic violation, and any evidence obtained after the stop was fruit of the poisonous tree. The trial court held an evidentiary hearing on the motion, at which Officers Glidewell and Barton testified. Based on the evidence at the hearing, the court denied the motion, finding the officers effected a valid traffic stop pursuant to A.R.S. § 28-754(A). On appeal, Appellant argues the court misinterpreted the statute and therefore erred in denying his motion to suppress.

¶9          We review a trial court's ruling on a motion to suppress based on the evidence presented at the suppression hearing, *State v. Newell*, 212 Ariz. 389, 396, ¶ 22, 132 P.3d 833, 840 (2006), and we view that evidence in the light most favorable to sustaining the ruling. *State v. Hausner*, 230 Ariz. 60, 70, ¶ 23, 280 P.3d 604, 614 (2012). We review for an abuse of discretion the factual findings underlying the court's determination, but review *de novo* its legal conclusion. *Newell*, 212 Ariz. at 397, ¶ 27, 132 P.3d at 841. We also defer to the trial court's assessment of witness credibility because that court is in the best position to make the determination. *State v. Olquin*, 216 Ariz. 250, 252, ¶ 10, 165 P.3d 228, 230 (App. 2007). We will affirm the judgment "on any grounds which were within the issues, such as where the correct legal result was reached even though it was based on the wrong reason." *State v. Dugan*, 113 Ariz. 354, 356, 555 P.2d 108, 110 (1976) (citations omitted).

¶10         At the suppression hearing, the officers testified that, at approximately 3:15 a.m. on October 11, 2011, they were travelling in a marked patrol car northbound on I-17. The vehicle directly in front of them was the Impala. Without signaling, the Impala exited I-17 via the Glendale Avenue exit ramp and continued north to the intersection at Glendale Avenue. The patrol car took the same route.

¶11         The Glendale Avenue exit ramp has one lane that feeds into two lanes, which parallel three other surface road lanes, all of which

intersect Glendale Avenue. The Impala travelled down the exit ramp and into the left-most lane (L-1) at the point that the exit ramp lane split and fed into two lanes (L-1 and L-2), each of which permitted a left-hand turn at the Glendale Avenue intersection. The patrol car remained directly behind the Impala as the vehicles waited at the traffic signal to turn left, or westbound, onto Glendale Avenue. When the traffic signal permitted, the Impala proceeded to the left. Instead of proceeding westbound on Glendale Avenue, however, the Impala made a U-turn as if it were going to re-enter I-17 in the southbound direction. The officers continued to follow the Impala because it had committed traffic violations by failing to use a turn signal the entire time after leaving the highway.

¶12 The officers' testimony at the suppression hearing varied slightly as to what happened next. According to Officer Glidewell, after the Impala took the left-hand U-turn and was moving toward the southbound I-17 entrance ramp, the driver made an abrupt, "semi-quasi" right-hand U-turn back across multiple southbound lanes to enter a convenience store parking lot. Because the store's entrance was blocked for southbound vehicles in the Impala's lane, the Impala could only reach the parking lot by making "an over-exaggerated right turn almost like going into opposing [southbound] traffic." Officer Glidewell testified that the patrol car's emergency lights were not activated until after the Impala began making the improper right-hand turn. Officer Barton agreed the Impala turned abruptly to enter the convenience store parking lot. Further, although he acknowledged his police report indicated he activated the patrol car's emergency lights to initiate the traffic stop "as the [traffic] signal turned green and the maroon Impala turned westbound," he stated his "recollection" was that "the lights were not on until they were already moving into the [convenience store]." Nevertheless, he conceded during cross-examination that "the reason for the stop" was the left-hand turn at the intersection, even though there were "other violations" as well.

¶13 The statute on which the traffic stop was ostensibly based, A.R.S. § 28-754, provides in relevant part as follows:

> A.    A person shall not turn a vehicle at an intersection unless the vehicle is in proper position on the roadway . . . or otherwise turn a vehicle from a direct course or move right or left on a roadway unless and until the movement can be made with reasonable safety. A person shall not so turn any vehicle without giving an appropriate signal in the manner

5

provided by this article in the event any other traffic may be affected by the movement.

B.      A signal of intention to turn right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning.

¶14        Appellant argued that, assuming Officer Barton activated his lights at the intersection, no violation of § 28-754 had occurred before the lights were activated because the Impala never changed lanes to turn left after it had exited I-17.  Instead, the driver simply continued down the exit ramp, which, due to the lane split, automatically led him into the left-most left-turn lane, and that was sufficient to indicate he intended to proceed to the left.  Appellant further maintained there was no need to display a left-turn signal at the intersection because the Impala could only turn left at the traffic light based on the lane it was in, and therefore, no traffic was "affected" by the failure to signal before the stop.  The State countered that a violation occurred on the exit, before the lane split, when the driver failed to indicate which of the multiple lanes headed toward Glendale Avenue he intended to select.  The State also maintained that a violation occurred when the Impala made the "erratic" right turn across multiple lanes of traffic without signaling.

¶15        After taking the matter under advisement, the trial court ruled the stop was legal under § 28-754(A).  The court reasoned that, under the statute, "a driver turning a vehicle from a direct course or moving right or left on a roadway must give an appropriate signal 'in the event any other traffic may be affected by the movement,' " and "[t]his requirement applies equally to lane changes as to turns."  Relying on *State v. Starr*, 222 Ariz. 65, 213 P.3d 214 (App. 2009), the court found the violation occurred when the driver "failed to signal while exiting the I-17 freeway."  The court rejected Appellant's argument that other traffic was not affected by the movement of the Impala, reasoning as follows:

As illustrated in the maps included in the Motion and the exhibits admitted, vehicles exiting northbound I-17 toward Glendale Avenue have a single lane.  As they exit, they have five lanes to choose from:  two turning left, including the innermost lane that permits a U-turn, and three that go either straight or right.  Other vehicles following a vehicle exiting the freeway need to know whether it intends to veer left toward the left two lanes or right toward the others.  In

that circumstance, "other traffic may be affected by the movement of the vehicle."

¶16        On appeal, Appellant argues the trial court erred, both in concluding a signal was required by the lane split and in concluding the failure to signal affected any traffic. He urges us to reject the reasoning of *Starr* and find the stop was unlawful. This we decline to do.

¶17        We reject Appellant's argument that all the Impala did was to continue forward within its lane and that § 28-754(A) is therefore unconstitutionally vague as applied to this situation.[4] Appellant mischaracterizes the situation. The single lane exit lane did not "continue"; instead, it ended when the exit lane encountered the surface road leading toward Glendale Avenue. The statute requires "a signal of intention to turn right or left" - either of which was an option for the Impala at that point - be given "not less than the last one hundred feet travelled . . . before turning." It is undisputed the driver of the Impala never signaled his intention to proceed via the left turn lanes at any point before entering the surface road. Therefore, the trial court did not err by finding a violation occurred on the exit ramp.[5] *See Dugan*, 113 Ariz. at 356, 555 P.2d at 110.

¶18        Nor, as Appellant argues, does the fact that neither the patrol car nor the Impala altered its course of travel toward the

---

[4]        Appellant's reliance on *Burton v. State Department of Transportation*, 240 P.3d 933, 936 (Idaho Ct. App. 2010), for this argument is inapposite. In *Burton*, the statute required a signal for a turn "onto a highway," to "move a vehicle right or left upon a highway," or to "merge onto or exit from a highway." *Id.* at 935-36. The defendant had driven into a single lane that stemmed from the merger of two lanes. *Id*. at 936. The Idaho Court of Appeals held the statute was unconstitutionally vague as applied under those circumstances because a signal was not required when two lanes "blend into a single lane." *Id*. That is not the situation here, where the single lane exit ramp ended and the driver was confronted with a choice of five lanes for possible forward travel.

[5]        Appellant focuses on Officer Barton's acknowledgement that his report indicated he turned the emergency lights on as the Impala took the left-hand turn at the traffic light. However, both Officer Barton and Officer Glidewell also considered the Impala to have committed a traffic violation by failing to signal before reaching the intersection.

intersection establish that no traffic was affected by the failure to signal. In *Starr*, we held that "an actual change in movement by a non-turning vehicle" is unnecessary to a finding that traffic was "affected." 222 Ariz. at 72, ¶ 24, 213 P.3d at 221. That is because:

> A driver who makes an un-signaled turn or *move* deprives other drivers of a warning that a change of course is about to take place. To the extent that information enters into the decision-making calculus of a nearby driver, that driver "may be affected." It is not necessary to speculate in what way another driver may have reacted; rather, it is enough that the move may influence the factors a driver would consider in order to drive safely.

*Id*. (emphasis added).

**¶19** Here, the patrol car qualified as "other traffic [that] may be affected" by the Impala's actions because it was travelling directly behind the Impala as both vehicles approached the five lanes. *See id*. at ¶ 23 (recognizing California cases holding that a patrol car itself, traveling behind a target vehicle, may be considered "affected" traffic). The Impala could have chosen to move into the right lanes going toward Glendale Avenue or even the outside left turn lane (L-2) as it travelled down the exit ramp. The failure to signal before reaching the five-lane roadway deprived the officers of any warning concerning the Impala driver's intentions, thereby limiting the officers' ability to plan and adjust to the Impala's future movements.

**¶20** Furthermore, although not the basis for its ruling, the trial court noted the evidence presented at the hearing established the Impala "made an unlawful right-hand turn from the left-hand lane across two lanes" when it entered the convenience store parking lot, and both officers testified they believed the Impala had initiated this turn before they activated the patrol car's emergency lights. Thus, the stop was lawful on this basis as well. *See* § 28-754(A) (requiring a turn signal before making a lane change); *cf. State v. Windus*, 207 Ariz. 328, 331, ¶ 16, 86 P.3d 384, 387 (App. 2004) (finding that police officers' unlawful entry did not bar prosecution for aggravated assault and resisting arrest because that was "new, distinct criminal conduct" occurring after entry).

**¶21** The trial court did not abuse its discretion; instead, it properly denied Appellant's motion to suppress. *See Dugan*, 113 Ariz. at 356, 555 P.2d at 110.

## II.    Constitutionality of A.R.S. § 13-3102(A)(1)(b)

¶22        Before trial, Appellant moved to dismiss Count III, the misdemeanor misconduct with a weapon charge, which was based on his having lied to the police officers when asked if he had any weapons. Appellant argued that A.R.S. § 13-3102(A)(1)(b), under which the offense was charged, violates the Fifth Amendment privilege against self-incrimination by "compel[ling] individuals to make potentially incriminating statements."  After holding a hearing, the trial court denied the motion, finding the statute constitutional.  Appellant renews his constitutionality argument on appeal.

¶23        We review *de novo* matters of statutory interpretation and constitutional law.  *State v. Roque*, 213 Ariz. 193, 217, ¶ 89, 141 P.3d 368, 392 (2006).  We will affirm the court's ruling if it is legally correct for any reason.  *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984).

¶24        The challenged statute, A.R.S. § 13-3102(A)(1)(b), provides in relevant part that "[a] person commits misconduct involving weapons by knowingly . . . [c]arrying a deadly weapon . . . concealed on his person . . . [w]hen contacted by a law enforcement officer and failing to accurately answer the officer if the officer asks whether the person is carrying a concealed deadly weapon."  For purposes of the statute, "'[c]ontacted by a law enforcement officer' means a lawful traffic or criminal investigation, arrest or detention or an investigatory stop by a law enforcement officer that is based on reasonable suspicion that an offense has been or is about to be committed."  A.R.S. § 13-3102(M)(1).

¶25        Appellant argues that A.R.S. § 13-3102 compels an answer because even a person who remains silent faces prosecution under the statute, as that person may also be said to fail to "accurately answer" a police officer.  According to Appellant, the statute is therefore unconstitutional because it potentially makes the election to remain silent "punishable as a class one misdemeanor."  That is not, however, what happened factually in this case.

¶26        Appellant neither remained silent nor invoked his Fifth Amendment privilege against self-incrimination in response to questioning.  Instead, he chose to respond by knowingly lying to the officers.  Contrary to the trial court's preliminary finding, Appellant

therefore lacked standing to raise a Fifth Amendment challenge to the statute.[6]

¶27        "Traditionally, a person to whom a statute may constitutionally be applied does not have standing to challenge that statute simply because it conceivably could be applied unconstitutionally in other cases." *State v. Musser*, 194 Ariz. 31, 32, ¶ 5, 977 P.2d 131, 132 (1999) (citations omitted). This precept applies save for a narrow exception to the standing requirement in the First Amendment area. *Id.*

¶28        Furthermore, a person who desires the protection of the Fifth Amendment privilege must claim it at the time he relies on it. *Salinas v. Texas*, 133 S. Ct. 2174, 2179 (2013) (citations omitted). A proper invocation of the Fifth Amendment right against compulsory self-incrimination permits an individual to remain silent, but not to swear falsely. *Brogan v. United States*, 522 U.S. 398, 404-05 (1997) (citations omitted). The record contains no evidence Appellant invoked his Fifth Amendment right or attempted to rely on it before responding to the question about whether he possessed a weapon. Consequently, Appellant lacked standing to argue the statute impermissibly violates the constitutional rights of a person invoking the Fifth Amendment.

¶29        Appellant chose to answer and lie to the officers by claiming he was unarmed. The Fifth Amendment does not protect a person from lying or making false statements to law enforcement. *See id.* at 404 (stating that "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie"). *See also Bryson v. United States*, 396 U.S. 64, 72 (1969) ("Our legal system provides methods for challenging the Government's right to ask questions – lying is not one of them." (footnote omitted)). Therefore, although a person "may decline to answer the question, or answer it honestly, [] he cannot with impunity knowingly and willfully

---

[6]        The trial court found Appellant had standing because a person who remains silent about possessing a concealed weapon has "fail[ed] to accurately answer." Nevertheless, the court found the statute constitutional because: (1) "[i]t does not penalize someone for remaining silent about a crime that has been committed," it merely "conditions one's right to carry a deadly weapon on answering accurately when asked about it by police"; and (2) "it only requires disclosure of a crime in progress," and as a prohibited possessor, Appellant was committing a crime by possessing a weapon.

answer with a falsehood" and later claim the protection of the Fifth Amendment. *Id.*

¶30         The trial court did not err in denying Appellant's motion to dismiss the charge, albeit for reasons we do not and need not address. We therefore affirm its decision. *See Perez*, 141 Ariz. at 464, 687 P.2d at 1219.

### III.    *Prosecutorial Vouching & Motion for Mistrial*

¶31         At trial, Officer Barton testified on direct examination that, in addition to his law enforcement training, he held two master's degrees, including a master of divinity from the New Orleans Baptist Theological Seminary in Louisiana.   Via questioning during cross-examination, defense counsel called attention to the fact that no video or audio recordings or signed confession existed to corroborate the officer's testimony regarding Appellant's "spontaneous statements" in the patrol car or subsequent incriminating admissions.   Defense counsel summarized by asking, "So the only thing that we have that talks about this confession, if you will, is, again, your word; is that fair?"

¶32         On redirect examination, the prosecutor noted that Officer Barton's integrity was challenged during cross-examination "with respect to all we have is your word."  The prosecutor then elicited Officer Barton's testimony that, as "a sworn peace officer," he had taken "an oath to protect and serve" and "[u]phold the laws" and that the public relied on him "to come into court and tell us what happened because we weren't there."  Defense counsel objected to this line of questioning as "vouching," but was overruled.  The prosecutor also noted Officer Barton had "another job" as a pastor, and asked, "Are you going to risk your job as a police officer and a pastor to commit a felony and commit perjury and lie?" Defense counsel's "vouching" objection was again overruled, and Officer Barton was permitted to respond, "No, ma'am."

¶33         Before the start of trial the next day, defense counsel renewed the issue, including his argument regarding vouching, and requested a mistrial.  In the alternative, counsel asked the court to *voir dire* members of the jury "to assess what their religious beliefs might be and if they would be more inclined to believe an individual who's a pastor" and whether Officer Barton's "religious standing" would affect their view of his testimony.  Counsel based his request for a mistrial on Rule 610 of the

Arizona Rules of Evidence.[7]   Counsel further requested that the court couple the *voir dire* of each individual juror with a curative instruction defense counsel had written.[8]   Counsel maintained that the situation necessitated doing both "to ensure . . . the jurors we're reading this curative instruction to can follow that instruction."

**¶34**        The trial court denied the motion for mistrial, noting that defense counsel had not objected to the testimony on the basis of Rule 610, but on the basis of "vouching."   The court stated it did not believe the prosecutor had engaged in vouching about the credibility of the witness. Regarding Rule 610, the court found the prosecutor's questioning came "pretty close to Rule 610 stuff" and was "on the border."   The court nonetheless denied a motion for mistrial based on Rule 610, finding any unfair prejudice could be cured by giving counsel's proposed curative instruction.   The court also denied the request to *voir dire* the individual jurors because doing so would "draw more attention to this issue than it deserves."   Consistent with its ruling, the court read defense counsel's proposed curative instruction to the jury during final instructions.

**¶35**        On appeal, Appellant contends the trial court committed three errors when ruling on Officer Barton's testimony:  (1) overruling his vouching objections at trial; (2) denying his motion for mistrial; and (3) refusing to *voir dire* the individual jurors.

**¶36**        A mistrial is the most dramatic remedy for trial error and is proper only when justice will be thwarted if the current jury is allowed to consider the case.  *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983).  The trial judge retains broad discretion in deciding if a mistrial is

---

[7]     Rule 610 provides:  "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."

[8]     Counsel's proposed instruction, which was modeled after Revised Arizona Jury Instruction Standard Criminal 34 (Testimony of Law Enforcement Officers), read as follows:

> The testimony of a witness is not entitled to any greater or lesser importance or believability merely because of the fact that the witness is a member of a certain faith or religion or because the witness is a religious official.   You are to consider the testimony of all witnesses the same, regardless of their faith, religion, or role in a religion.

warranted because he or she is in the best position to determine if the evidence will affect the outcome of the trial. *State v. Jones*, 197 Ariz. 290, 304, ¶ 32, 4 P.3d 345, 359 (2000). Being present, the trial judge is best able to sense the atmosphere of the trial, the manner in which the objectionable statements were made, and any possible effect on the jury. *State v. Koch*, 138 Ariz. 99, 101, 673 P.2d 297, 299 (1983). It therefore rests with the trial judge to determine whether a remedy short of mistrial is sufficient. *See Jones*, 197 Ariz. at 304, ¶ 32, 4 P.3d at 359. We review the denial of a motion for mistrial for an abuse of discretion. *Koch*, 138 Ariz. at 101, 673 P.2d at 299.

### A. Vouching

**¶37**         Impermissible prosecutorial vouching occurs when the prosecutor places the prestige of the government behind a witness or suggests that information not presented to the jury supports the witness's testimony. *State v. King*, 180 Ariz. 268, 276, 883 P.2d 1024, 1032 (1994) (citation omitted). The State argues that Officer Barton's testimony that he would not risk his employment as either a pastor or police officer by committing perjury is not vouching because it suggested neither the prosecutor's personal belief in the officer's credibility nor that information not available to the jury supported the officer's testimony. According to the State, the testimony merely provided evidence that Officer Barton lacked a motive to lie and faced adverse consequences if he did, which is permissible. *See, e.g., State v. Lamar*, 205 Ariz. 431, 441, ¶ 52, 72 P.3d 831, 841 (2003) (finding a prosecutor did not engage in misconduct by introducing evidence that a witness agreed to testify truthfully in exchange for a plea agreement).[9] Appellant argues it did both because the fashion in which the prosecutor elicited the statements "placed the weight and prestige of the State, as well as . . . a Christian God, behind Officer Barton's testimony," and introduced matters beyond the record into the proceedings solely to bolster the officer's credibility.

**¶38**         We understand how the prosecutor's allusion to the fact that, as a police officer, Officer Barton had taken an "oath to protect and serve" and was counted on to come into court and recount what had happened might be viewed as placing the prestige of the government behind his testimony. We also understand how the prosecutor's allusion to Officer Barton's other "job" as a pastor, which was superfluous and not germane to the investigation or the trial, might be interpreted as nothing

---

[9]         *Supplemented by* 210 Ariz. 571, 115 P.3d 611 (2005).

more than an attempt to simply bolster his credibility with matters not of record. Nonetheless, the trial court's finding that the testimony was not vouching was not unreasonable. In the overall context of cross- and redirect examinations, the jury could have viewed the questions and Officer Barton's testimony as simply countering defense counsel's implications that Officer Barton's recollections about Appellant's admissions were false or inaccurate. In any event, the statements were brief, and the prosecutor did not allude to them again at trial or in her closing arguments. Based on the record before us, we cannot say the fleeting comments permeated the tenor of the trial so as to render it unfair, or placed improper influence on the jury's verdicts. *See State v. Anderson*, 210 Ariz. 327, 340, ¶ 45, 111 P.3d 369, 382 (2005) (stating that this court will reverse a conviction for prosecutorial misconduct when there is misconduct by the prosecutor and "a reasonable likelihood [] that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial" (citations omitted)).[10] The trial court did not abuse its discretion in denying the motion for mistrial on this basis. *See Koch*, 138 Ariz. at 101, 673 P.2d at 299.

> B. *Motion for Mistrial Based on Rule 610 and the Failure to Voir Dire Individual Jurors*

¶**39** Appellant argues the trial court erred in denying a mistrial based on Officer Barton's testimony "regarding his religious position." In support of his argument, Appellant relies on Rule 610, as well as on *State v. Thomas*, 130 Ariz. 432, 636 P.2d 1214 (1981), in which our supreme court found that Article 2, Section 12, of the Arizona Constitution contains a "direct prohibition against questioning any witness as to his religious belief, for the purpose of affecting his credibility." *Id.* at 436, 636 P.2d at 1218 (quoting *Tucker v. Reil*, 51 Ariz. 357, 363, 77 P.2d 203, 205 (1938)).

¶**40** We agree with the trial court that, although the prosecutor's references to Officer Barton's status as a pastor came close to crossing the border of Rule 610 prohibitions, they do not actually do so. Unlike the prosecutor in *Thomas*, the prosecutor in this case did not question Officer Barton specifically about his religious or moral beliefs or his religious propensity. *See id.* at 434-35, 636 P.2d at 1216-17. Also unlike the prosecutor in *Thomas*, the prosecutor here did not suggest in her closing arguments that Officer Barton's testimony should be believed because of his religious status or beliefs. *See id.* at 435, 636 P.2d at 1217.

---

10      *Supplemented by* 211 Ariz. 59, 116 P.3d 1219.

¶41          The trial court determined the appropriate remedy was a curative instruction, rather than a mistrial, and gave the jury the instruction drafted by defense counsel.  That court was in the best position to sense the overall tenor of the trial and determine the appropriate remedy to address Appellant's concerns.  *See Jones*, 197 Ariz. at 304, ¶ 32, 4 P.3d at 359.   Based on the record before us, we conclude the court's decision to rely on a curative instruction was not an abuse of discretion. *See Koch*, 138 Ariz. at 101, 673 P.2d at 299.  For similar reasons, it also was not an abuse of discretion for the court to deny the request to *voir dire* the individual jurors based on its determination that doing so would have the detrimental effect of potentially drawing undue attention to the issue.  *See id*.

## CONCLUSION

¶42          Appellant's convictions and sentences are affirmed.



Ruth A. Willingham · Clerk of the Court
F I L E D :  MJT